IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division – Greenbelt)



| | |
|---|---|
| **William Whittman,**<br>15 New Plum Tree<br>Charles Town, WV 25414<br>*Plaintiffs*<br><br>v.<br>.<br>**National Association of REALTORS® (NAR),**<br>430 North Michigan Avenue<br>Chicago, IL 60611-4087,<br><br>**Virginia REALTORS® (VR),**<br>10231 Telegraph Road<br>Glen Allen, VA 23059,<br><br>**Northern Virginia Association of REALTORS® (NVAR),**<br>8407 Pennell Street<br>Fairfax, VA 22031,<br><br>**Maryland REALTORS® (MR),**<br>200 Harry S. Truman Parkway, Suite 200<br>Annapolis, MD 21401,<br><br>**Greater Capital Area Association of REALTORS® (GCAAR)**<br>15201 Diamondback Drive, Suite 100<br>Rockville, MD 20850,<br>Defendants.<br>                                *Defendants* | Civil Action N<u>LKG   25CV3120</u><br>Jury Demand |

## COMPLAINT

Plaintiff William Whittman, a licensed real estate broker in Maryland, the District of Columbia, and Virginia, brings this Complaint against Defendants National Association of REALTORS® ("NAR"), Virginia REALTORS® ("VR"), Northern Virginia Association of REALTORS® ("NVAR"), Maryland REALTORS® ("MR"), and Greater Capital Area Association of REALTORS® ("GCAAR"), seeking treble damages, punitive damages, and declaratory and injunctive relief for violations of the *Sherman Antitrust Act, 15 U.S.C. §§ 1–7*, the *Clayton Act, 15 U.S.C. §§ 12–27*, and related state competition and common law, stating as follows:.

## I. INTRODUCTION

1. This is an action under the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, the Clayton Act, 15 U.S.C. §§ 12–27, and related state laws.

2. Defendants are not mandated by any statute or regulation; no law requires a broker to join NAR, VR, MR, NVAR, or GCAAR to practice real estate. Licenses are granted by state commissions, not by these private associations. Yet Defendants have entrenched themselves as predatory gatekeepers, crippling the very industry they pretend to serve. Instead of facilitating REALTORS®' work, they have metastasized into parasites and leeches, spreading across the nation county by county, erecting tollbooths at every turn, and mimicking a cartel of unprecedented scale. In doing so, they have inflicted perhaps the greatest corporate harm ever imposed on an American profession—an infestation that has drained brokers, destroyed independent firms, and deceived the public for decades.

3. *Licensure Authority.* Real estate licensure is granted exclusively by state commissions created by statute. In Virginia, the Virginia Real Estate Board (Va. Code § 54.1-2106.1) issues licenses; in Maryland, the Maryland Real Estate Commission (Md. Code, Bus. Occ. & Prof. § 17-301) regulates licensure; and in the District of Columbia, the D.C. Real Estate Commission (D.C. Code § 42-2851.05) holds this authority. These governmental bodies—not NAR or its affiliates—confer the legal right to practice real estate and establish the education, testing, and professional requirements for brokers and agents.

4. *What the Law Actually Requires.* To obtain and maintain a license, a broker must comply with the statutory requirements of the relevant commission, including pre-licensing education, examination, continuing education, and adherence to state real estate laws and regulations. Nowhere do these statutes require membership in the National Association of REALTORS® or any local or state REALTOR® board. The only reason brokers like Plaintiff are compelled to join NAR, VR, MR, NVAR, or GCAAR is because these private associations have seized control of MLS systems, lockboxes, and standardized forms, erecting private tollgates where the law requires none—forcing brokers to pay repeatedly and still be denied statewide or nationwide access.

5. Defendants have intentionally and deliberately constructed a predatory scheme for profit, carried out in a despicable and heinous manner, by denying brokers and REALTORS® statewide and nationwide access even after they have paid dues at the local level that already fund state associations and the national umbrella. For example, Plaintiff here pays NVAR, which automatically funnels money to Virginia REALTORS® and the National Association of REALTORS®, yet he is

still blocked from accessing MLS, lockboxes, and forms in neighboring counties within Virginia unless he pays again and again to additional local boards. This racket transforms a state license—which by law authorizes practice anywhere in the state—into a worthless scrap of paper confined to the narrow county of the local board, nullifying the rights granted by state commissions and crippling brokers who have already paid.

6. Rather than facilitating real estate, Defendants have metastasized into parasites, leeches, and cancerous growths feeding on REALTORS® and the American public, devastating the profession, destroying Plaintiff's business, and inflicting nationwide harm by charging repeatedly for the same access while still denying it.

7. This abuse goes far beyond duplication; it metastasizes into non-ending local boards where, if any single membership were ever justified, it should have sufficed. Instead, brokers are forced to pay again and again across countless jurisdictions or else cease doing business in the very states whose commissions have licensed them—permitted to operate only in the narrow areas where they have paid these predators a fee to do what the state has already authorized them to do. These associations protect no one—neither REALTORS® nor clients—as the recent multibillion-dollar settlement has proved, exposing them as parasites masquerading as professional facilitators and proving they should be dismantled without delay for the protection of both the profession and the public they exploit.

8. Defendants' predatory abuses have metastasized into a system where almost every small jurisdiction, county by county, demands yet another membership fee before a broker can enter a property or use the tools necessary to complete a transaction.

9. A broker licensed by the state to sell anywhere in Virginia, Maryland, or the District of Columbia finds his rights crippled and conditioned not on law but on the greed of Defendants—who have transformed what should be a facilitative system into a parasitic racket.

10. What the state freely authorizes, Defendants unlawfully restrict, erecting artificial barriers and extracting tribute at every turn, not to protect REALTORS® or clients, but solely to enrich themselves by preventing licensed professionals from doing what they are already legally authorized to do.

11. Plaintiff has suffered millions of dollars in damages as a direct result of Defendants' unlawful restraints of trade, exclusionary practices, and fee structures designed to monopolize access to real estate transactions through heinous and predatory schemes that cripple and prevent licensed

professionals from exercising the very rights and access that state law has granted them. Defendants ought to have facilitated that access rather than obstructed it for greed and profit.

12. Their scheme represents perhaps the greatest harm an industry has ever suffered and one of the most devastating injuries to the American public in the nation's history.

13. Plaintiff seeks not only treble and punitive damages, but also structural reform: that one REALTOR® membership shall equal full statewide reciprocity, with no duplicative county dues and no blocking of access to forms, MLS, or lockboxes.

14. Defendants' conduct amounts not merely to antitrust violations but to a nationwide white-collar crime against REALTORS® and the American public, carried out under the false banner of professionalism—conduct that falls squarely within the prohibitions of the Sherman and Clayton Acts.

15. Plaintiff also brings this action to challenge Defendants' unlawful and coercive practice of intruding into real estate commission disputes — disputes that belong exclusively to real estate firms, not individual REALTORS®.

16. In the real estate industry, earned commissions are by law the exclusive property of licensed brokerage firms, not individual REALTORS®. These firms are legally distinct entities with their own state-issued brokerage licenses and federal tax identification numbers **(see Exhibits 5 & 6).**

17. Firms such as Proplocate Realty LLC are not dues-paying members of Defendants' associations, yet Defendants arrogate to themselves jurisdiction they do not and cannot possess, forcing brokers and agents into sham "arbitrations" before panels of unqualified REALTORS® under threat of losing MLS, lockbox, and forms access.

18. By coercing REALTORS® to surrender their firms' commissions under penalty of exclusion, and by consistently ruling in favor of large firms with hundreds of dues-paying members against small independents, Defendants have unlawfully interfered with Plaintiff's business, destroyed his firm, and usurped authority that belongs only to courts of law and state real estate commissions.

## II. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under *28 U.S.C. § 1331* because the claims arise under the *Sherman Antitrust Act* and the *Clayton Act*.

20. This Court also has jurisdiction under *28 U.S.C. § 1337* because this action arises under Acts of Congress regulating commerce and protecting trade and commerce against restraints and

monopolies, including the *Sherman Antitrust Act, 15 U.S.C. §§ 1–7*, and the *Clayton Act, 15 U.S.C. §§ 12–27*.

21. This Court has supplemental jurisdiction under *28 U.S.C. § 1367* over related state law claims, including unjust enrichment.

22. Venue is proper in this District under *28 U.S.C. § 1391* because Defendants transact business, collect dues, and maintain continuous and systematic contacts affecting commerce in the District of Maryland.

23. Personal jurisdiction is proper because Defendants have purposefully availed themselves of the privilege of conducting business in Maryland and the surrounding region, and Plaintiff's claims arise directly out of Defendants' contacts with this forum.

### III. PARTIES

24. Plaintiff William Whittman is a licensed real estate broker in Virginia, Maryland, and the District of Columbia, residing at *15 New Plum Tree, Charles Town, West Virginia*.

25. Defendant National Association of REALTORS® ("NAR") is a private Illinois non-profit trade association with its principal office at 430 North Michigan Avenue, Chicago, Illinois 60611-4087. Its registered agent for service of process is *Katherine R. Johnson, 430 North Michigan Avenue, Chicago, Illinois 60611-4087*.

26. Defendant Virginia REALTORS® ("VR") is a Virginia non-stock corporation with its principal office at 10231 Telegraph Road, Glen Allen, Virginia 23059. Its registered agent for service of process is *Laura Farley, 10231 Telegraph Road, Glen Allen, Virginia 23059*.

70. Defendant Northern Virginia Association of REALTORS® ("NVAR") is a Virginia non-stock corporation with its principal office at 8407 Pennell Street, Fairfax, Virginia 22031. Its registered agent for service of process is *Ryan McLaughlin, 8407 Pennell Street, Fairfax, Virginia 22031*.

81. Defendant Maryland REALTORS® ("MR") is a Maryland non-stock corporation with its principal office at 200 Harry S. Truman Parkway, Suite 200, Annapolis, Maryland 21401. Its

registered agent for service of process is *Chuck Kasky, 200 Harry S. Truman Parkway, Suite 200, Annapolis, Maryland 21401.*

29. Defendant Greater Capital Area Association of REALTORS® ("GCAAR") is a Maryland non-stock corporation with its principal office at 15201 Diamondback Drive, Suite 100, Rockville, Maryland 20850. Its registered agent for service of process is *Edward Krauze, 15201 Diamondback Drive, Suite 100, Rockville, Maryland 20850.*

## IV. FACTUAL ALLEGATIONS

30. Plaintiff is fully licensed by state real estate commissions to transact business anywhere within Virginia, Maryland, and the District of Columbia.

31. Defendants are not mandated by law; no state statute requires a broker to join NAR, VR, NVAR, MR, or GCAAR, as licensure is issued by the Virginia Real Estate Board, the Maryland Real Estate Commission, and the D.C. Real Estate Commission.

32. Defendants are nothing more than private corporations that have entrenched themselves as gatekeepers, constructing a tri-layered paywall of local, state, and national dues forcibly extracted to unlock MLS, lockboxes, and standard forms.

33. Without paying these tolls, a licensed broker cannot function in practice, meaning that what state law grants, Defendants obstruct—deliberately crippling brokers' ability to practice statewide and strangling competition.

34. This metastasized cartel has bled REALTORS® dry, enriching itself while leaving brokers like Plaintiff unable to expand, hire, or compete fairly.

35. Defendants are private associations, not public regulators; they operate as non-governmental trade associations organized under private corporate law, are not required by any statute or regulation for real estate licensure, have no legitimate regulatory authority, yet act as if they supersede state licensing boards by conditioning access to essential market tools, and function as a self-perpetuating monopoly expanding like a virus into every county and locality, demanding tribute at each checkpoint.

36. Despite Plaintiff's statewide authority, Defendants restrict access to essential tools of the profession—including MLS systems, lockbox services (SentriLock), and standard contract forms—by conditioning such access on membership dues at all three levels: local, state, and national.

37. **Exhibit 1** (NVAR 2026 Dues Receipt) demonstrates how Plaintiff is forced to pay cumulative fees to NAR, VR, and NVAR totaling $759 annually merely to maintain access to essential services in Virginia, yet such payments do not provide access outside NVAR's narrow jurisdictional boundaries.

38. Exhibit 2 (GCAAR 2025 Dues Receipt) demonstrates that Plaintiff is also forced to pay duplicative dues to the Greater Capital Area Association of REALTORS® (GCAAR), covering only Montgomery County, Maryland, and the District of Columbia, in the amount of $292 annually.

39. Yet even after paying both NVAR and GCAAR, Plaintiff and his agents cannot access forms, lockboxes, or MLS listings just across county lines within the same state unless they pay again and again to additional local boards—each requiring the broker of record to join first—thereby erecting artificial barriers that drive agents away, collapse transactions, and cripple business growth, even though access should be facilitated by dues already paid rather than denied and resold county by county.

40. This duplicative structure is not accidental but is mandated by NAR's "Three-Way Agreement," under which every local REALTOR® association is chartered by its state association and NAR, and every state association is chartered by NAR, so that membership in any local board automatically forces payment into the state and national associations.

41. As a result, Plaintiff is compelled to maintain multiple memberships in multiple jurisdictions—NVAR in Virginia, GCAAR in Maryland, and others if he wishes to expand—while paying into VR, Maryland REALTORS®, and NAR, creating a nationwide cartel structure that extracts fees at every level.

42. These compulsory memberships are not optional for brokers seeking to compete in the modern market, effectively creating a multi-layered toll for doing business in every jurisdiction in which a broker is licensed.

43. Local boards such as NVAR and GCAAR are not neutral arbiters but parasites and leeches masquerading as ethics bodies. In practice, they function as kangaroo courts where disputes between REALTORS® are systematically resolved in favor of large, well-connected firms such as Long & Foster, Century 21, RE/MAX, and Keller Williams, while small and independent brokers are penalized, coerced, and stripped of commissions.

44. These boards abuse their control over MLS, lockboxes, and forms as weapons of punishment rather than facilitation, and even overstep by penalizing non-members—all in furtherance of Defendants' cartel scheme.

45. This conduct is not isolated but reflects a nationwide pattern that has metastasized for decades. Defendants' structure is nothing less than a white-collar crime syndicate masquerading as professional associations—parasites, leeches, and cancerous growths feeding on REALTORS® while claiming to protect them.

46. Defendants' scheme has unjustly enriched Defendants by billions of dollars, drained the livelihoods of countless brokers, and, in Plaintiff's opinion, rises to the level of heinous white-collar crime warranting federal investigation.

47. As a result, Plaintiff's business expansion was stifled; in 2005, Proplocate Realty LLC grew to 300 agents, with a firm valuation exceeding $2 million, but agents left when Defendants' rules prevented them from freely accessing MLS and forms statewide without paying duplicative membership dues in every jurisdiction.

48. Plaintiff alleges that but for Defendants' anticompetitive restraints, Proplocate Realty LLC would have expanded nationwide, employing thousands of agents and generating tens of millions of dollars in enterprise value.

49. The same conduct by Defendants has already been exposed and condemned in *Sitzer/Burnett v. NAR*, Case No. 4:19-cv-00332 (W.D. Mo.), where a jury found NAR liable for antitrust violations in 2023.

50. The Sherman Antitrust Act, 15 U.S.C. §§ 1–7, prohibits contracts, combinations, and conspiracies in restraint of trade and monopolization. The Clayton Act, 15 U.S.C. §§ 12–27, including §§ 15 and 26, provides private plaintiffs with the right to recover treble damages, costs, and attorney's fees, and to obtain injunctive relief. Defendants' conduct violates both Acts.

51. Beyond these violations, Defendants have also unlawfully extended their claimed jurisdiction to real estate commissions—property that legally belongs to firms, not to individual REALTORS®.

   a. Commissions are payable only to licensed brokerage entities, not to individual agents or brokers.
   b. Real estate firms such as Plaintiff's Proplocate Realty LLC are not dues-paying members of NAR, VR, MR, NVAR, or GCAAR. **(See Exhibits 1–2)**
   c. Accordingly, these associations have no jurisdiction or contractual authority over firm commissions.

52. Despite this, Defendants created a fraudulent system where commission disputes are falsely styled as "Realtor A vs. Realtor B" (see Exhibit 3), disguising the reality that commissions are disputes between firms. They rely on coercion and threats of expulsion—loss of MLS, lockbox, and

forms access—to force REALTORS® to comply with board rulings they have no authority to make.

53. Real estate commissions are not the property of individual REALTORS® but of licensed firms, which are distinct legal entities with their own state-issued brokerage licenses and IRS tax identification numbers (see Exhibit 6).

54. Checks for commissions are always paid directly to firms, not agents (**see Exhibit 4).** Thus, firms—who are not members of these associations—never consented to arbitration by Defendants.

55. Every such dispute in which Plaintiff's agents participated was decided in favor of larger firms with hundreds of dues-paying members, such as Long & Foster, Century 21, RE/MAX, or Keller Williams, and against Plaintiff's firm, Proplocate Realty.

56. Each adverse ruling caused Plaintiff's agents to leave immediately for larger firms, devastating Plaintiff's brokerage.

57. Defendants' abuse of the statutory term "broker" has been central to this unlawful scheme.

58. While statutes in Virginia, Maryland, and the District of Columbia use the term "broker" in connection with commissions, in law and practice this refers to the licensed brokerage entity—not an individual REALTOR® who holds a broker's license. **(See Exhibit 6).**

59. The proof is conclusive: every commission check is made payable to the firm (**see Exhibit 4).**

60**.** By distorting this definition and coercing REALTORS® under threat of cutting off MLS and lockbox access, Defendants have unlawfully arrogated power over firm-owned commissions.

61.This conduct constitutes coercion, extortion, and tortious interference, and represents a nationwide pattern of ultra vires abuse for which Defendants have never had jurisdiction or authority.

## COUNTS

**Count I – Violation of Sherman Act § 1 (Unreasonable Restraint of Trade)**

62. Section 1 of the *Sherman Antitrust Act, 15 U.S.C. § 1*, prohibits every contract, combination, or conspiracy in restraint of trade. Courts have held that agreements among competitors that erect artificial barriers, fix conditions of market entry, or restrict access to essential

facilities are unlawful restraints of trade, whether per se illegal or unreasonable under the rule of reason.

63. Defendants, through their "Three-Way Agreement" and coordinated practices, have combined and conspired to restrain trade by conditioning access to MLS systems, lockboxes, and standard forms on duplicative local memberships, while denying statewide or reciprocal access even after dues are paid.

64. Brokers like Plaintiff must pay NVAR, GCAAR, VR, MR, and NAR, yet their access remains confined to the narrow county jurisdiction of the local board.

65. This scheme converts what should be a single statewide license into a patchwork of artificial toll booths, forcing brokers to pay again and again to multiple county associations merely to do what state licensure already authorizes.

66. Such conduct serves no legitimate pro-competitive purpose, but instead enriches Defendants while crippling competition, driving independent brokers out of business, and reducing consumer choice.

67. Plaintiff has been directly injured in his business and property as a result of this unlawful restraint of trade, including the loss of agents, collapsed transactions, diminished firm value, and the destruction of a once-thriving brokerage enterprise.

**Count II – Violation of Sherman Act § 2 (Monopolization)**

68. *Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2,* makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire … to monopolize any part of the trade or commerce among the several States." To state such a claim, a plaintiff must allege (a) the possession of monopoly power in the relevant market and (b) the willful acquisition or maintenance of that power through anticompetitive conduct rather than through growth or development as a consequence of a superior product, business acumen, or historic accident.

69. Defendants collectively possess monopoly power over the essential tools of modern real estate practice, including multiple listing services (MLS), electronic lockbox systems (such as SentriLock), and standardized real estate forms. These tools are indispensable for brokers to compete, transact, and represent clients in residential and commercial real estate.

70. Rather than facilitating access, Defendants have willfully leveraged their control to maintain and expand monopoly power by restricting access to these tools on a county-by-county basis, even after brokers have paid dues that already flow to the state and national associations. By

refusing reciprocity and statewide access, Defendants prevent licensed brokers from competing freely, reduce consumer choice, and suppress competition from independent firms.

71. This monopolistic scheme has directly injured Plaintiff by driving away agents, collapsing transactions, and destroying business expansion, while unjustly enriching Defendants through duplicative dues. Absent judicial intervention, Defendants will continue to abuse their monopoly power to the detriment of REALTORS®, independent brokerages, and the public at large.

**Count III – Violation of Clayton Act § 3 (Unlawful Tying Arrangement)**

72. *Section 3 of the Clayton Act, 15 U.S.C. § 14*, prohibits tying arrangements in which the sale of one product or service is conditioned on the purchase of another, where the effect is to substantially lessen competition or create monopoly power.

73. Defendants have imposed such an arrangement through the "Three-Way Agreement" and related practices. The tying product is mandatory membership in local REALTOR® associations such as NVAR and GCAAR. The tied products are the indispensable tools of real estate practice: MLS access, electronic lockboxes, and standard forms.

74. Plaintiff does not challenge the requirement that reasonable dues be paid once for these tools. The grievance is that even after paying NVAR or GCAAR — dues that already flow in part to the state associations (VR or MR) and to NAR — Defendants unlawfully deny access to MLS, forms, and lockboxes in neighboring counties or other parts of the state, unless additional memberships and duplicate dues are purchased again and again.

75. This practice forces brokers to buy duplicative memberships far beyond what is necessary, turning what should be a single statewide license into a patchwork of county tollgates. It renders meaningless the payments already made to state associations and to NAR, which should provide statewide and nationwide reciprocity but instead are used to justify endless local extractions.

76. By requiring perpetual and duplicative payments while still withholding access, Defendants' scheme substantially lessens competition, burdens independent brokers, drives agents from smaller firms, and coerces REALTORS® into paying for memberships they neither need nor use simply to avoid exclusion from markets they are otherwise licensed by law to serve.

77. Plaintiff has been directly injured by this unlawful tying scheme, suffering millions of dollars in damages through lost agents, collapsed transactions, diminished firm value, and the destruction of his brokerage's growth.

**Count IV – Tortious Interference with Prospective Business Advantage**

78. Under common law, tortious interference with prospective business advantage occurs when a defendant, knowing of a plaintiff's valid business expectancies, intentionally and improperly interferes with those relationships, causing the plaintiff to lose expected economic benefits. See, e.g., *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 303 (4th Cir. 2002) (recognizing claim where defendants interfered with plaintiffs' business relationships and prospective contracts).

79. Plaintiff's brokerage, PropLocate Realty LLC, built such valid and concrete expectancies between 2004 and 2005, growing from nothing to more than 100 producing REALTORS® within three months, and to over 300 within a year. PropLocate drew agents from across the three states where Plaintiff was licensed — from as far north as Baltimore, Maryland, to as far south as Richmond, Virginia, from Annapolis in the east to Winchester and Front Royal in the west. By 2007, PropLocate had achieved such success that Fairfax Realty offered $2 million to acquire the firm.

80. Defendants knew that Plaintiff's brokerage depended on its agents' ability to access MLS listings, electronic lockboxes, and standardized forms — tools that are indispensable for completing transactions. Defendants also knew that these agents, though licensed by their state commissions to practice statewide, would be unable to function if Defendants restricted their access.

81. Defendants intentionally and improperly interfered with Plaintiff's business expectancies by conditioning access to MLS, forms, and lockboxes not only on membership in one association, but on endless duplicative memberships in multiple county-based associations. Even after Plaintiff had paid into NVAR and GCAAR, and through those dues funded the state associations (VR and MR) and the national association (NAR), Defendants still denied Plaintiff's agents access unless additional memberships were purchased for each county where those agents lived or worked.

82. Because only the broker of record could join on behalf of agents, Defendants' practices made it impossible for Plaintiff's agents to access the tools they needed without Plaintiff incurring crippling, duplicative fees. Agents left PropLocate rather than remain bound by a system that blocked them from selling where they were licensed to practice.

82. As a direct result of Defendants' interference, Plaintiff's brokerage collapsed: transactions failed, agents departed, and PropLocate's fair market value was destroyed. Plaintiff lost not only his prospective $2 million sale to Fairfax Realty, but also the nationwide expansion that PropLocate was poised to achieve but for Defendants' unlawful conduct.

**Count V – Unjust Enrichment**

84. Under Maryland law, and as recognized in federal courts, a claim for unjust enrichment requires that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances that make it inequitable to retain it without payment of value. *Hill v. Cross Country Settlements, LLC, 936 A.2d 343, 351 (Md. 2007); Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d 321, 325 (D. Md. 2007).* Courts have further recognized that unjust enrichment may arise where defendants enrich themselves through anticompetitive conduct that inflates prices or coerces payments. *In re Processed Egg Prods. Antitrust Litig., 851 F. Supp. 2d 867, 913 (E.D. Pa. 2012).*

85. Plaintiff and his agents conferred substantial benefits upon Defendants by paying mandatory dues to NVAR, GCAAR, and other local associations, which in turn funded state associations (VR, MR) and the national association (NAR). These payments totaled hundreds of dollars annually per broker, multiplied across decades and across millions of REALTORS® nationwide, amounting to billions of dollars in revenue.

86. Defendants had knowledge of these payments and accepted them, representing that such dues were necessary to support access to MLS systems, lockboxes, and standardized forms essential for real estate practice.

87. Yet Defendants retained these payments under circumstances that are inequitable and unjust: even after collecting dues at the local, state, and national levels, Defendants refused to provide statewide or reciprocal access, forcing Plaintiff and others to pay duplicative fees to additional county boards or else be excluded from practicing where their state license otherwise authorized them to operate.

88. By retaining the benefits of these payments while simultaneously denying the access they should have conferred, Defendants have unjustly enriched themselves at Plaintiff's expense. The enrichment is not incidental but structural, designed to maximize Defendants' revenue while crippling brokers and depriving them of the very access they paid for.

89. Plaintiff has been directly damaged by this unjust enrichment through lost transactions, departing agents, reduced firm value, and collapse of business growth, while Defendants continue to accumulate billions in ill-gotten gains. Equity demands restitution and disgorgement of the unjust profits Defendants have extracted.

**Count VI – Ultra Vires Jurisdiction and Coercive Interference with Firm Property Rights**

90. Real estate commissions are, by law, the property of licensed brokerage firms, not individual REALTORS®. State real estate commissions issue firm licenses (see Exhibit 6), and title companies pay commission checks directly to firms **(see Exhibit 4).**

91. Real estate firms, including Plaintiff's firm Proplocate Realty, are not dues-paying members of NAR, VR, MR, NVAR, or GCAAR **(see Exhibits 1–2).** Only individual brokers and salespersons are members. Accordingly, Defendants have no contractual or statutory authority over firms or their commissions.

92. Despite this, Defendants have arrogated to themselves unlawful jurisdiction over commission disputes between firms. They conceal this overreach by restyling such matters as disputes between REALTORS® ("Realtor A vs. Realtor B"), even when the actual parties in interest are distinct brokerage firms **(see Exhibit 3).**

93. This practice is ultra vires, unlawful, and constitutes coercive interference with firm property rights. Defendants enforce it through threats to cut off MLS, lockbox, and forms access if REALTORS® refuse arbitration, thereby coercing agents to surrender commissions belonging to their firms under penalty of economic death.

94. Courts have encountered REALTOR® arbitration disputes before, but the critical distinction that commissions belong exclusively to firms — non-members over whom Defendants have no jurisdiction — has been obscured by Defendants' deceptive framing. This systemic deception has allowed Defendants to perpetuate their unlawful scheme for decades.

95. In all three jurisdictions — Virginia, Maryland, and the District of Columbia — the statutory term "broker" refers to the licensed brokerage entity, not the individual REALTOR®.

96. This fact is proven by every commission check in practice: settlement and title companies issue earned commission checks only to the licensed firm **(see Exhibit 4),** never to the individual REALTOR®, even if that REALTOR® personally holds a broker's license. The firm is the legal payee, the legal owner, and the only lawful recipient of commissions.

97. Maryland. Under *Md. Code, Business Occupations & Professions § 17-322(b)(2)*, a real estate salesperson may accept compensation only from the real estate broker with whom the salesperson is affiliated. In Maryland law, the "broker" referenced here is the licensed brokerage entity, not the individual REALTOR®. This is proven in practice by every commission check, which settlement companies issue directly to the brokerage firm **(see Exhibit 4).**

98. Virginia. *Va. Code § 54.1-2139(A)* mandates that all fees, commissions, or other valuable consideration received by a real estate salesperson shall be paid only to the licensed real estate broker

under whom the salesperson is licensed. Once again, the statutory "broker" is the brokerage firm (e.g., Proplocate Realty LLC), not the individual REALTOR® holding a broker's license. The commission checks confirm this reality beyond dispute **(see Exhibit 4).**

99. District of Columbia. *D.C. Official Code § 42-2853.196(2)* requires that a real estate salesperson shall accept compensation for real estate services only from the real estate broker to whom the salesperson is licensed. As in Maryland and Virginia, the "broker" here is the licensed firm — a separate legal entity with its own brokerage license and tax identification number. Commission checks are paid to the firm, never to the individual REALTOR® *(see Exhibit 4).*

100. Thus, under each state statute, commissions are the exclusive property of the licensed real estate firm — a separate legal entity with its own brokerage license and IRS tax identification number (see Exhibit 6). Real estate firms are not dues-paying members of NAR, VR, MR, NVAR, or GCAAR. These cartel organizations therefore have no statutory, contractual, or jurisdictional authority over commissions. By styling firm-versus-firm disputes as REALTOR®-versus-REALTOR® disputes, Defendants deliberately distort the statutory meaning of "broker," conceal their lack of authority, and unlawfully coerce REALTORS® into surrendering firm-owned commissions.

101. Defendants' conduct has directly harmed Plaintiff: each time such an arbitration was forced, Plaintiff's firm lost commissions, agents left to join larger firms favored by Defendants, and Plaintiff's brokerage collapsed as a result.

102. This coercive system is not only anticompetitive but an unlawful usurpation of judicial authority, since commission disputes are contract and property matters to be decided only by courts of law or, in limited contexts, state real estate commissions — never by private associations of REALTORS®.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Award treble damages under 15 U.S.C. § 15 in the amount of $50,000,000, or such greater or lesser sum as the jury may determine is just and proper;

B. Award punitive damages in the amount of $2,000,000,000, to punish Defendants' willful, malicious, decades-long predatory conduct — a metastasized cancer and parasitic leeching scheme that represents the longest and largest financial injury to REALTORS® and the American public in history;

C.  Enter declaratory and injunctive relief under the Sherman Act, the Clayton Act, and state real estate statutes, requiring that one REALTOR® membership shall equal full statewide reciprocity, eliminating duplicative county dues, prohibiting blocking of access to MLS, lockboxes, and forms, and ensuring REALTORS® may practice anywhere within their licensed state as authorized by law;

D.  Declare unlawful and enjoin permanently Defendants' ultra vires practice of asserting jurisdiction over real estate commission disputes belonging to licensed brokerage firms, which are not dues-paying members of Defendants' associations and over whom Defendants have no statutory or contractual authority;

E.  Prohibit Defendants from conditioning REALTORS®' access to MLS, lockboxes, and forms on forced submission of firm commission disputes to their boards or so-called "arbitration" panels;

F.  Order restitution of commissions wrongfully diverted through such unlawful "arbitrations" in favor of larger firms and against Plaintiff, and restore commissions to the firms to whom they legally belong under state law;

G.  Award Plaintiff costs of suit, including reasonable attorneys' fees and expert witness fees as permitted by law; and

H.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ William Whittman
15 New Plum Tree
Charles Town, WV 25414
Tel: (202) 391-5582
Pro Se Plaintiff

*William Whittman*